**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| American Federation of Labor and Congress of Industrial Organizations,<br>    815 16th St., NW<br>    Washington, DC 20006<br><br>American Federation of State, County & Municipal Employees,<br>    1625 L Street, NW<br>    Washington, DC 20036-5687<br><br>American Federation of Teachers,<br>    555 New Jersey Ave., NW<br>    Washington, DC 20001<br><br>National Nurses United<br>    8455 Colesville Road<br>    Silver Spring, MD 20910<br><br>    Plaintiffs,<br><br>    v.<br><br>United States Department of Education,<br>    400 Maryland Ave SW<br>    Washington, DC 20202<br><br>Linda McMahon, *in her official capacity as United States Secretary of Education*,<br>    400 Maryland Ave SW<br>    Washington, DC 20202<br><br>    Defendants. | Case No. _____<br><br>Jury Trial: No |

**COMPLAINT**

**INTRODUCTION**

1.  The Department of Education (Department or ED) recently promulgated a rule that defies the very statute it purports to implement. The Reimagining and Improving Student Education (RISE Rule), 91 Fed. Reg. 23768 (May 1, 2026), purports to define "professional student" as

1

someone enrolled in one of only eleven named programs, even though the statute the Department claims to implement—the Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14 (Reconciliation Act or Act), Pub. L. 119-21, 139 Stat. 72 (July 4, 2025)— expressly sets forth an open-ended three-part functional test, expressly incorporated from an existing regulation, to determine whether a program of study qualifies as a "professional" program. While the regulation from which that open-ended definition was drawn listed ten of these eleven named programs as *illustrative* examples, its coverage extended to many more degrees than those eleven.

2. Qualifying as a "professional" has significant consequences. It allows a student to borrow up to $50,000 per year (or $200,000 in aggregate) in unsubsidized, federal loans, rather than only up to the $20,500 per year ($100,000 in aggregate) limit applicable to graduate students in programs deemed non-professional by the Reconciliation Act.

3. The Department's new, unprecedented regulatory constraint thus cuts in half the federal student loans that advanced practice nurses, teachers, social workers, librarians, and public health practitioners—among many others—would be entitled to borrow under the statute.

4. Limiting access to federal student loans for professional study in this arbitrary manner is not only bad policy, it violates the Administrative Procedure Act (APA) in several ways.

5. First, by defining "professional student" in a manner that conflicts with the statutory definition set forth in the Reconciliation Act, the Department's rule does not accord with the law and must, therefore, be vacated and set aside under 5 U.S.C. § 706(2)(A).

6. Second, by issuing a regulatory definition without statutory warrant, the Department exceeded its statutory authority and the Rule must, therefore, be vacated and set aside under § 706(2)(C).

7. Third, by excluding professions based on irrelevant criteria, using administrative codes for disclaimed and arbitrary purposes, exacerbating short-staffing crises in many bona fide professions, and rejecting viable, lawful alternatives without reasoned explanation, the RISE Rule is arbitrary, capricious, and an abuse of discretion. It must therefore be vacated and set aside under § 706(2)(A).

8. But the definition of "professional" is not the only fatal flaw in the regulation.  By restricting the transitional provision—an interim exception for student borrowers enrolled in a higher education program as of June 30, 2026—with additional regulatory criteria that, again, have no statutory warrant, the rule again discords with its organic statute, exceeds the Department's authority, and is arbitrary and capricious. The unauthorized restrictions on the interim exception must also be vacated and set aside.

9. Finally, the Department has flouted express statutory provisions set forth in the Higher Education Act of 1965 (HEA), which require any change in the direct loan program to be published by November 1 before a loan-award year in order to become effective by the second award year—i.e., July 1—after the November 1 publication. 20 U.S.C. § 1089(c)(1). Under the HEA, therefore, the RISE Rule had to be published before November 1, 2025, to be effective by July 1, 2027. The RISE Rule, however, was published in May 2026 and purports to go into effect on July 1, 2026, a full year early. The rule thus flouts statutory commands and directly undermines the predictability Congress sought to afford federal student lending. It therefore must be vacated and set aside for these reasons, too.

10. Plaintiffs are unions—the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO); American Federation of State, County & Municipal Employees (AFSCME); American Federation of Teachers (AFT); and National Nurses United (NNU)—

3

that objected to the RISE Rule because its several legal defects, if allowed to stand, will harm their members by requiring them to either take on more expensive, riskier private loans or forgo their professional study entirely. Doing so, Plaintiffs and their members fear, will hamper their careers and their professions more generally. And these financial obstacles to the professional development of advanced practice nurses, teachers, social workers, librarians, and public health practitioners will ultimately harm patients, children, readers, American health, and Americans who depend on social service. The Reconciliation Act and HEA preclude the Rule from effectuating these harms.

### JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331.

12. Venue is proper in this district under 28 U.S.C. § 1391(b)(1)–(2) and (e)(1), as well as 5 U.S.C. §§ 702 and 703. Defendants are a United States agency or officers sued in their official capacities who reside in this judicial district and who promulgated the challenged rule in this judicial district.

### PARTIES

### I.   Plaintiffs

13. The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) is a federation of 65 national and international labor organizations that represent 15 million working people.

14. The AFL-CIO brings this lawsuit on behalf of its affiliated unions' members affected by the RISE Rule.

a. AFL-CIO affiliated unions represent members across a wide range of professions: nurses, educators, social workers, journalists, musicians, public health practitioners, to name just a few.

b. Many of these members are directly harmed by the RISE Rule. Many would be considered "professional students" under the 2025 Reconciliation Act but not under the RISE Rule. As a result, many would be entitled to borrow up to $50,000 annually ($200,000 in aggregate) under the statute but only $20,5000 annually ($100,000 in aggregate) under the rule. The rule's lower caps on federal student loans require these members either to borrow additional financing from other sources, generally, on less favorable terms, or to forgo (or delay) career-advancing graduate education. These members have standing to challenge the RISE Rule in their own right.

c. As set forth in Article II of its Constitution, the AFL-CIO's principal objectives include aiding workers in securing improved working conditions; securing legislation that promotes the rights of workers; and promoting inclusion in the economy, in government, and throughout society. These objectives include assisting workers in obtaining access to education needed to foster their careers. This lawsuit thus pursues objectives germane to the AFL-CIO's purposes.

15. The American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME) is a national labor organization and unincorporated membership association with approximately 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states (including Maryland), the District of Columbia, and Puerto Rico, and is headquartered in Washington, D.C.

16. AFSCME brings this lawsuit on behalf of its members affected by the RISE Rule.

a.  AFSCME represents members across a wide range of professions, including nurses, social workers, library scientists, and public health workers. Its members all have one thing in common: dedication to making our communities stronger, healthier, and safer.

b.  Many of these members will be directly harmed by the RISE Rule. Many would be considered "professional students" under the Act but not under the RISE Rule. As a result, many would be entitled to borrow up to $50,000 annually ($200,000 in aggregate) under the statute but only $20,5000 annually ($100,000 in aggregate) under the rule. The rule's lower caps on federal student loans require these members either to borrow additional financing from other sources, generally, on less favorable terms, or to forgo (or delay) career-advancing graduate education. These members have standing to challenge the RISE Rule in their own right.

    i.  For example, AFSCME has a member in Michigan who works as a licensed Registered Nurse. This member has been successful in his nursing practice, having obtained multiple certifications and experience in a variety of specialties. This member would like to become a Nurse Practitioner, which would require this member to complete a Master of Science in Nursing (MSN). Because the RISE Rule does not define MSN as a professional degree, however, this member cannot afford to obtain an MSN. This member will miss out on the opportunity to advance in his career, to enhance his earning potential, and to contribute the full extent of his skills to this country's healthcare system.

    ii.  AFSCME also has a member in California who works as a licensed Registered Nurse. This member has been a nurse for six years and would like to become a Nurse Practitioner so that she can help address the lack of access to primary care providers in her area.

6

Becoming a Nurse Practitioner requires getting a MSN. However, because the RISE Rule does not define MSN as a professional degree, this member no longer believes it is financially possible to pursue MSN programs. She does not know how she would be able to finance her degree without sacrificing her housing stability. As a result, this member will lose out on career advancement opportunities that would provide greater job stability and allow her to give back to her community.

c.  AFSCME's mission is to represent its members, advocate for fairness in the workplace, safety on the job, fair wages, good benefits, a secure retirement, and excellence in public services. This includes ensuring its members have access to educational opportunities, as reflected by the fact that many AFSCME-negotiated collective bargaining agreements (CBAs) contain provisions designed to facilitate AFSCME-represented employees pursuing graduate education. Federal educational loan programs help AFSCME members afford the educational opportunities necessary to advance in their careers serving their communities. This lawsuit thus pursues objectives germane to AFSCME's purposes.

d.  AFSCME itself will be harmed as an entity as well. Many AFSCME-negotiated CBAs contain provisions designed to facilitate AFSCME-represented employees' pursuit of graduate education. These include commitments from AFSCME members' employers to offer tuition reimbursement up to specified dollar amounts for members to pursue graduate degrees. With graduate education financially out-of-reach for many AFSCME members under the RISE Rule, this benefit will lose much of its value to many members. AFSCME will have to then bargain for better tuition reimbursement provisions, thereby expending its bargaining power where it otherwise would not have to. Otherwise, the value of this bargained-for benefit will be severely diluted.

17. The American Federation of Teachers (AFT) is a labor organization of that represents 1.8 million members who work in education, healthcare, and public services.

18. AFT brings this lawsuit on behalf of its members affected by the RISE Rule.

   a. AFT represents K-12 educators, academic workers (including full- and part-time faculty, academic professionals, and graduate employees), healthcare workers, and other public service workers.

   b. Many of these members are directly harmed by the RISE Rule. Many would be considered "professional students" under the Act but not under the RISE Rule. As a result, many would be entitled to borrow up to $50,000 annually ($200,000 in aggregate) under the statute but only $20,5000 annually ($100,000 in aggregate) under the rule. The rule's lower caps on federal student loans require these members either to borrow additional financing from other sources, generally, on less favorable terms, or to forgo (or delay) career-advancing graduate education. These members have standing to challenge the RISE Rule in their own right.

      i. For example, AFT has an associate member who is a senior in college, majoring in Exercise Science. This member planned to pursue a career in healthcare as an Occupational Therapist, working with children. This summer, she plans to work as a volunteer with children with physical disabilities. She has begun exploring advanced degree programs to pursue her career goal of Occupational Therapist by obtaining a Doctorate in Occupational Therapy. However, the RISE Rule does not define such a degree as "professional," meaning she will be subject to lower federal student loan caps. This member is uncertain that she can finance her continued education. Even if she can, she will be harmed by the lower loans caps because fewer of her loans will be entitled to

8

forgiveness through Public Service Loan Forgiveness and she will likely have to take private loans at a higher interest rate and without the benefits that come from federal student loans.

ii. AFT also has a member who works in the healthcare field who intends to pursue a Psychiatric Mental Health Nurse Practitioner (PMHNP) degree. The RISE rule's narrow definition of "professional" degree creates a dilemma for this member. Public universities in her state offer only a doctorate degree in this field, and due to the length of the program she would likely need to borrow more than the "graduate"" degree cap to complete the degree. Ironically, she is considering doing a shorter master's program with a higher tuition rate at a private university in order to stay within the borrowing limits and avoid taking out private loans.

iii. Lastly, AFT has a member who is pursuing her Doctor of Public Health (DrPH) degree to advance her career as a public health advocate. At the same time, she is raising a family and working full time as an assistant dean at a top-rated university. Given the many competing commitments, she has considered withdrawing from her degree program to focus on her family and career. Because the RISE rule does not define a DrPH as a professional degree, she is concerned that she will not be able to afford to continue her advanced degree if she were to withdraw and later reenter.

c. As set forth in Article II of its Constitution and Bylaws, AFT principal objectives include promoting the welfare of children and its members by providing progressively better educational, health and social service opportunities; to improve standards for teachers, paraprofessionals and school-related personnel, higher education faculty and professionals, state and local public employees, healthcare employees and other workers, by promoting

better preparation; to improve the standards for registered nurses, allied health professionals and other healthcare employees by promoting continuing education; to improve standards for public employees by promoting continuing education; and to encourage retention of competent teachers including by promoting educational programs. These objectives include assisting workers in obtaining access to education needed to foster their careers. This lawsuit thus pursues objectives germane to AFT's purposes.

19. AFT will also be harmed as an organization. The RISE rule's exclusion of both teaching degrees and nursing degrees from the definition of "professional" will make it more difficult and less attractive for students to enter the nursing and teaching profession. This will exacerbate worker shortages in these fields resulting in fewer potential members for AFT and additional stress on existing AFT members related to understaffing. AFT also regularly bargains CBA provisions that would provide financial assistance to members seeking professional degrees. The RISE rule's limitations on borrowing will create additional financial need for AFT members to pursue professional degrees in their field, thus diluting the value of these benefits. And finally, AFT expends substantial resources to assist members navigating student loan repayment issues in the form of student debt clinics and debt counseling services. The RISE rule's lower borrowing caps for nursing and teaching degrees will result in new AFT members entering these professions having greater private student debt burdens. Accordingly, AFT will need to divert additional resources to its student loan assistance programs to help members navigate more complex student loan challenges.

20. NNU is a labor organization that represents 225,000 RNs across the nation, many of whom pursue advanced nursing degrees after becoming RNs. NNU is headquartered in Silver Spring, MD.

21. NNU brings this lawsuit on behalf of its members affected by the RISE Rule.

    a.  NNU represents nurses. Many of these members are directly harmed by the RISE Rule. Many—particularly those enrolled in Masters of Science in Nursing (MSN) and Doctor of Nursing Practice (DNP) programs—would be considered "professional students" under the Act but not under the RISE Rule. As a result, many would be entitled to borrow up to $50,000 annually ($200,000 in aggregate) under the statute but only $20,5000 annually ($100,000 in aggregate) under the rule. The rule's lower caps on federal student loans require these members either to borrow additional financing from other sources, generally, on less favorable terms, or to forgo (or delay) career-advancing graduate education. These members have standing to challenge the RISE Rule in their own right.

    b.  As set forth in Article I of its Constitution, NNU's principal objectives include advocating for direct care nurses on all public policy matters related to nursing practice. These objectives include assisting workers in obtaining access to education needed to foster their careers. This lawsuit thus pursues objectives germane to NNU's purposes.

## II.   Defendants

22. The United States Department of Education is a federal agency within the executive branch of the United States government. 20 U.S.C. § 3411.

23. Linda E. McMahon is the United States Secretary of Education. She is charged with the supervision and management of all decisions and actions of the United States Department of Education. Plaintiffs sue her in her official capacity. 20 U.S.C. § 3412.

STATEMENT OF FACTS

## I.   The Higher Education Act and the William D. Ford Federal Direct Loan Program

11

24. In 1965, Congress enacted the Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1255 (1965). That law, among other things, created a Guaranteed Student Loan program. Under that program, the federal government did not itself extend loans to students; it instead guaranteed loans made by participating private lenders in the event of a student default.

25. In 1993, Congress enacted the Student Loan Reform Act of 1993, Pub. L. 103-66, 107 Stat. 340 (1993), which amended the HEA and established the William D. Ford Direct Loan program (Direct Loan Program). *See* 20 U.S.C. §§ 1087–87j. Under this program, the federal government itself directly made loans to undergraduate and graduate students, rather than guaranteeing loans extended by private institutions.

26. The Student Loan Reform Act continued the GSL program but renamed it the Federal Family Education Loan (FFEL) program. *See* 20 U.S.C. §§ 1071 to 1087–4.

27. Initially, Congress anticipated that the Direct Loan program would replace the guarantee program, FFEL. But, in 1998, Congress amended HEA (Pub. L. 105-244), to repeal the provisions anticipating that the Direct Loan program would ultimately succeed FFEL. From 1994 through 2010, both the Direct Loan and the guarantee programs operated side-by-side.

28. In 2010, Congress ended FFEL. Health Care and Education Reconciliation Act of 2010. Pub. L. No. 111-152, 124 Stat. 1029 (2010). As a result, since 2010, the Direct Loan program has been the principal federal student loan program for postsecondary education.

29. The Direct Loan program made three types of loans available, and also allowed for a fourth, consolidation option: (1) Direct Subsidized Loans were available only to undergraduate students with financial need; (2) Direct Unsubsidized Loans were available both to undergraduate students and graduate students; (3) Direct PLUS Loans could be borrowed by

graduate students; and (4) Direct Consolidation Loans allowed borrowers to combine debt from multiple existing federal student loans into a single new loan.

30. From the student-borrowers' perspective, the Direct Loan program offers several advantages over private loans. The main advantage is that the terms of the loan are set by law, rather than by private entities making market-based decisions. This results in several specific advantages. Federal student loans are not due until after graduation, whereas private lending institutions may (and often do) require repayment while the student is still enrolled in school. Federal student loans have fixed interest rates, which are often lower than private loans and much lower than credit card interest rates, whereas private student loans can have variable or fixed interest rates and are often much higher than federal rates. Federal student loans (other than PLUS loans) do not require a credit check to qualify, whereas private loans often require either an established credit record or a cosigner. Federal student loans can be consolidated into a Direct Consolidation Loan, whereas private loans cannot (but may be refinanced). Federal student loans impose no prepayment penalty fee, whereas private loans may. Federal student loans may be eligible for forgiveness if the student goes on to work in public service, whereas private lenders typically do not offer loan forgiveness for public service work.

31. From July 1, 2012, through the enactment of the Reconciliation Act in 2025, the Direct Loan program offered graduate students two main kinds of loans. First, if financially independent, graduate students could obtain up to $20,500 annually ($138,500 in aggregate) in Direct Unsubsidized Loans. Second, they could obtain additional Direct PLUS loans not subject to any statutory limit—except that all federal loans, in combination, could not exceed the cost of attendance of the program. Neither program determined loan availability based on financial need.

32. The Direct PLUS loans were available regardless of the type of graduate program the student enrolled in.

33. Additionally, students pursuing certain degrees that entail "specialized training requiring exceptionally high costs of education" had access to higher Stafford Unsubsidized loan limits, as set by the Secretary of Education under the Higher Education Act. 20 U.S.C.A. § 1078-8(d)(2)(A). Since 1998 the Secretary had "increased the aggregate loan limits for graduate and professional students enrolled in certain approved health profession programs (as defined by Section 703(a) of the Public Health Act)." 91 FR 4254-01.

## II.    The Reconciliation Act

34. On July 4, 2025, Congress enacted into law an Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. 119-21, 139 Stat. 72 (July 4, 2025).

35. Title VIII, Subtitle B of the Reconciliation Act addressed loan limits under the HEA.

36. Section 81001 of the Reconciliation Act amended section 455(a) of the HEA, 20 U.S.C. § 1087e(a), in several ways. It eliminated Direct PLUS loans for graduate and professional students, and it imposed annual and aggregated caps on unsubsidized loans for graduate and professional students.

37. Those caps, for the first time, differed by program of study. Graduate students in non-professional programs, as defined by the Act, are subject to annual caps of $20,500 and aggregate caps of $100,000 in unsubsidized loans. By contrast, professional students, as defined in the Act, are subject to annual caps of $50,000 and aggregate caps of $200,000 in unsubsidized loans.

38. The Act sets forth express definitions to distinguish between graduate and professional students.

39. It defines a graduate student to mean "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *See* 139 Stat. 335.

40. It defines a professional student to mean "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on the date of enactment of this paragraph), upon completion of the program." *Id.*

41. President Trump signed the Reconciliation Act into law on July 4, 2025, making that date the effective date for purposes of the professional student definition under § 81001.

42. As of July 4, 2025, 34 C.F.R. 668.2 defined a "professional degree" as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

43. The Act also imposes a lifetime aggregate cap of $257,500 on all federal loans a student may borrow, whether for undergraduate, graduate, or professional degrees.

44. The Act did not amend the Secretary's authority to set higher Stafford Unsubsidized loan limits for degrees entailing "specialized training requiring exceptionally high costs of education" under the Higher Education Act. 20 U.S.C.A. § 1078-8(d)(2)(A).

45. The Act further affects parent borrowers who take out student loans to finance their dependent's undergraduate education. Before the Act, parents could take out Direct PLUS loans up to the estimated cost of attendance. The Act now caps parent loans at $20,000 per year and $65,000 total per dependent student. 20 U.S.C. § 1087e(5).

15

46. For certain students and parent borrowers, Section 81001 also sets forth an "interim exception" to its new loan limits. 139 Stat. 336 (Paragraph 8). Under that exception, the new annual and aggregate caps on unsubsidized loans (paragraph 4) and the lifetime cap (paragraph 6) shall not apply "during the expected time to credential [defined in the Act] with respect to an individual who, as of June 30, 2026—(i) is enrolled in a program of study at an institution of higher education; and (ii) has received a loan under this part for such program of study." *Id.* (Paragraph 8(A)). The Act, in turn, defines "expected time to credential" as the time remaining to complete a program or three academic years, whichever is less. *Id.* (Paragraph 8(B)).

47. By its terms, this interim exception allows graduate students enrolled in a graduate program on June 30, 2026, and borrowing federal unsubsidized loans, to continue borrowing unsubsidized loans—not subject to the Reconciliation Act's caps—until they complete their program. The same is true for parents of similarly situated undergraduate students.

## III.    The RISE Rule negotiated rulemaking and notice of proposed rulemaking

48. The HEA requires the Secretary of Education to adhere to statutorily specified calendar dates in administering the Direct Loan program and other student assistance programs. Relevant here, HEA provides that "any regulatory changes initiated by the Secretary affecting the programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). The beginning of the award year is defined as July 1. 20 U.S.C. § 1088(a)(1).

49. On April 4, 2025—three months before the enactment of the Reconciliation Act—ED announced its intent to engage in negotiated rulemaking regarding the various student assistance programs the agency administers under Title IV of the HEA.

16

50. On May 12, 2025—nearly two months before the Reconciliation Act's enactment—ED announced a schedule of committee meetings for that negotiated rulemaking.

51. On July 25, 2025, ED announced its intent to establish negotiated rulemaking committees regarding Title IV, HEA programs. Intent to establish negotiated rulemaking committees, 90 Fed. Reg. 35261 (July 25, 2025). The HEA itself requires ED to use negotiated rulemaking when making changes to student loan regulations. 20 U.S.C. § 1098a(b).

52. Following that announcement, ED convened a Reimagining and Improving Student Education (RISE) negotiated rulemaking Committee.

53. The Committee was composed of representatives of educational institutions, students and borrowers, State officials, financial aid administrators, loan servicers, and other groups.

54. The Committee met in two sessions, from September 29 to October 3, 2025, and again from November 3 through 7, 2025.

55. On September 29, 2025, ED opened the negotiations by proposing to define a "professional student" as a student enrolled in one of the ten programs listed as illustrative examples in the 2025 regulation, 34 C.F.R. § 668.2, unless the Secretary separately designated an additional program through further rulemaking.

56. The next day, a representative of student borrowers, Deborah Lilly, circulated a proposal that identified two issues.

57. First, she noted that the "proposed definition of 'Professional Student' introduces a fixed list of degree types that qualify as 'professional degrees,' suggesting that it is exhaustive. However, this approach diverges from the current regulatory language in 34 CFR § 668.2, which defines 'professional degree' using functional criteria and a non-exhaustive list of

*examples*. The proposed language risks excluding students in rigorous, licensure-dependent programs not explicitly named, despite meeting the established criteria."

58. Second, she noted that the "proposed definition fails to account for graduate programs that have historically qualified as health professions under the existing loan limit exemptions." She added that omitting "these programs from the new definition risks reducing access to necessary funding for students pursuing careers in critical health professions. These students undergo extensive post-baccalaureate training, clinical or supervised practice, and often require professional licensure, which meets the functional criteria of professional education. Yet, by excluding them from the enumerated list, the proposed regulatory definition imposes disadvantages and financial inequities on a cohort that has previously been recognized for its professional rigor and public service impact."

59. Ms. Lilly thus recommended revising the proposed definition of "professional student" to reflect that the degrees listed in the then-current regulation were "illustrative and not exhaustive." Doing so, she explained, would "ensure consistency with the statutory framework under *Pub. L. 119-21* and the existing regulatory definition in 34 CFR § 668.2."

60. During the negotiating sessions, the Department made a few modifications to its original proposed definition of "professional student." But it never acknowledged the force of the student borrower representative's October 1, 2025, objections and certainly never modified its proposed rule to address those objections.

61. On January 30, 2026, ED published a notice of proposed rulemaking (NPRM), titled Reimagining and Improving Student Education (RISE). 91 Fed. Reg. 4254 (Jan. 30, 2026).

62. The proposed rule sought to define "professional student" as a student enrolled in a program that awards a professional degree upon completion, which it further defined as one that (1)

18

signified completion of academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree; (2) is generally at the doctoral level and requires six academic years of postsecondary education; (3) generally requires professional licensure to begin practice; and (4) includes a four-digit program Classification of Instructional Programs (CIP) code, in the same intermediate group as eleven specified programs. 91 Fed. Reg. 4254, 4332.[1]

63. CIP codes are six-digit numbers the National Center for Education Statistics (NCES) developed as general categories for taxonomic purposes. NCES specifically disclaimed any intent to use CIP codes as "a regulatory device." NCES, *Introduction to the Classification of Instructional Programs: 2020 Edition (CIP-2020)*.

64. Ten of the eleven programs specified in the proposed rule had been listed as illustrative examples in the pre-Reconciliation Act version of 34 C.F.R. § 668.2. Clinical psychology is the only profession that did not appear in the codified regulation and was new to the proposed rule.

65. The Department stated the reasons it proffered for this regulatory definition at pages 4260–68 of the RISE NPRM.

66. The RISE NPRM specifically set forth reasons for excluding business, education, occupational therapy, naturopathic medicine, nursing, physical therapy, physician assistant, public health, social work, and pilot training and licensure from the programs deemed professional under the NPRM. *Id.* at 4265–67.

---

[1] These are pharmacy, dentistry, veterinary medicine, chiropractic, law, medicine, optometry, osteopathic medicine, podiatry, theology, and clinical psychology.

67. The RISE NPRM also proposed to exclude any students who "withdr[ew] or otherwise cease[d] to be enrolled in the program of study" from the interim exception. *Id.* at 4333. In the Department's view, the exception is available only "to borrowers who remain enrolled in a program of study as required by Section 81001" of the Reconciliation Act. *Id.* at 4275. If a borrower transfers or withdraws, even temporarily, the borrower "is no longer enrolled." *Id.* As a result, the Department would apply the Reconciliation Act's new loan caps to any borrower enrolled in a qualifying program as of June 30, 2026, who later transferred programs or temporarily withdrew before reenrolling. This same limitation of the interim exception would subject parent borrowers who borrow on behalf of their dependent undergraduate to the updated limits on parental loans, if their dependent were to transfer or temporarily withdraw.

68. Finally, the RISE NPRM explained that "the increased annual and aggregate loan limits established by the Secretary for graduate and professional students enrolled in certain approved health profession programs will not apply to loans made on or after July 1, 2026." 91 FR 4277. In other words, students in high-cost programs would no longer have access to higher Unsubsidized Stafford loan limits.

69. Over 80,000 comments were submitted in response to the RISE NPRM. Approximately 97% of these comments objected to the proposed rule.

70. Each of the Plaintiff unions submitted comments objecting to the rule's proposed definition of "professional student." Those comments are attached as Exhibits 1–4.

71. Specifically, among other points, the unions objected that the proposed rule (1) requires a program to be one of eleven specified programs to be professional, whereas the statute used open-ended functional criteria, illustrated by examples; (2) excludes professions that allow practitioners to begin practice without a degree or license, or that require supervision by a

20

licensed practioner, and thus invents extra-statutory requirements or illicitly converts statutory conditions sufficient for professional status into regulatory requirements; (3) misuses CIP codes for disclaimed purposes, does so without any empirical showing that they track the statutory criteria, and excludes many CIP codes that meet the statutory criteria; (4) excludes programs historically recognized as professional; (5) imposes roadblocks to student financing that erect barriers to entry to short-staffed professions, with devastating impacts on education, health care, and other critical public-minded services; and (6) fails to consider other public policy impacts of the rule.

72. Other commenters objected to additional aspects of the RISE Rule NPRM, including ED's extra-statutory requirements narrowing the interim exception to pre-existing borrowers who do not change qualifying programs or temporarily withdraw before reenrolling. Commenters pointed out that the Rule's limitations on the interim exception were not derived from the statutory text and that revoking transfer students' eligibility to obtain the interim exception would be significantly disruptive. *See* 91 Fed. Reg. at 23,814. Commenters also noted that students who temporarily withdraw from a program of study and then re-enroll will not be eligible for the interim exception, even though the statutory language does not contemplate such a result. *Id*. at 23,813.

73. Commenters also objected to the Department's decision to end the practice of setting higher loan limits for high-cost degrees under the Higher Education Act. Commenters pointed out that "preserving this eligibility makes certain that qualified students can pursue medical and other health professions degrees without unnecessary financial barriers," and that "tuition, fees, and clinical requirements" for advanced nursing degrees "exceed even the professional student loan caps." 91 Fed. Reg. at 23,818.

21

### IV.     The final RISE Rule

74. On May 1, 2026, ED published its final rule. *Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768 (May 1, 2026).

75. By its terms, the final RISE Rule became effective on July 1, 2026.

76. The final rule made no changes to the NPRM's proposed definition of "professional degree." *Id.* at 23,783–84.

77. The Department recognized some, but not all, objections to its proposed definition. *Id.* at 23783. It made no changes based on the objections it received.

78. It set forth its position at 91 Fed. Reg. 23,783–23,809.

79. The Department also made no changes to its regulatory limits on the interim exception, high-cost degree exceptions, or the PSLF program.

### V.     The RISE Rule's impacts

80. The RISE Rule will exclude several professions that meet the statutory criteria for professional students, thereby imposing the lower loan caps on students seeking to enroll in such programs even though they would qualify for the higher caps under the Reconciliation Act.

81. As a result, individuals pursuing these programs will have fewer financial resources available than authorized under the Reconciliation Act. Students that cannot afford their program without borrowing up to the higher caps "may have to drop out of their program" due to their inability to pay.  Final Rule, 91 Fed. Reg. at 23,856. Those who had planned on enrolling may no longer be able to afford to pursue their degrees at all. Thus, the lower loan limits are likely to yield a drop in graduates in these programs which will impose a host of negative impacts on the critical public services that graduates of these programs provide.

82. Healthcare is one such example. The Rise Rule treats students pursuing advanced nursing degrees—including those in Masters of Science in Nursing (MSN) and Doctor of Nursing Practice (DNP) programs—as non-professionals. This will preclude many nurses from becoming Advanced Practice Registered Nurses (APRNs), like Nurse Practitioners (NPs), Certified Registered Nurse Anesthetists (CRNAs), and Certified Nurse Midwives (CNMs), as the degree programs required for those advanced practice nursing certifications typically cost far more than the student loan limits for "graduate" degrees under the RISE Rule. For those nurses who choose to pursue advanced nursing degrees, the RISE Rule will thus force them to take out additional private loans, generally on more onerous terms, thus exposing them to greater financial risk. For nurses that cannot afford to pursue these degrees, the RISE Rule will prevent them from entering these advanced roles. Either way, the provision of health care will suffer from exacerbated shortages and from APRNs practicing under additional stress: the new financial barriers will reduce access to primary care services for countless patients by limiting NPs, will reduce access to anesthesia services and procedures that require anesthesia by limiting CRNAs, and will limit access to labor and delivery services by limiting CNMs. Reducing the availability of new APRNs will also disproportionately impact rural areas, urban safety net providers, and medically underserved communities, where APRNs constitute a growing percentage of providers providing these critical services, and in many regions are already the majority providers.

83. Another example is education. The Rise Rule also treats advanced teaching programs as non-professional, even though many states do require teachers to obtain a master's degree within a specified period after beginning their teaching career—and many require advanced degrees for various specialty teaching positions. These specialized positions include Reading Specialists

and Instructional Coaches and Specialized Instructional Support Personnel (SISP), including School Librarians and Media Specialists, School Counselors, Social Workers, Nurses, and Speech-Language Pathologists. For educators that are either required to or wish to obtain advanced degrees so that they can enter these positions, the RISE Rule will force them to take out additional private loans, generally exposing them to more financial risk. In the alternative, the Rise Rule will force educators to forgo teaching entirely or abandon their plans to enter specialized roles. Not only will individual educators be harmed by the RISE Rule as a result, but the quality of public education will suffer nationwide as shortages emerge in these critical positions.

84. Social services is yet another example. The RISE Rule excludes social work (MSW) from professional programs even though such degrees meet the statutory requirements set forth by the Reconciliation Act. At the same time, social work is experiencing a crisis in staffing, with researchers predicting a "massive social worker shortage by 2030."[2] The RISE Rule threatens to exacerbate this shortage. One of the drivers of the social worker shortage is stagnation of wages, and limiting access to loan financing will only heighten the financial strain that social workers already face. The RISE Rule may force individuals to take out additional private loans, generally on more onerous terms, thus exposing them to greater financial risk. This may lead more graduates to pursue higher-paying private sector jobs, negatively impacting community institutions that rely on social workers. Others may choose to forgo their plans to become social workers. The result is there will be fewer social workers at a time when the need for the services such workers provide is accelerating.

---

[2] Columbia School of Social Work, *Bridging the Gap: The Urgent Need for Social Workers* (Sept. 23, 2023), available online at https://socialwork.columbia.edu/news/bridging-gap-urgentneed-social-workers

85. Library services are also threatened by the RISE Rule. The RISE Rule excludes Library science (MLS) even though these degrees also meet the statutory requirements set forth by the Reconciliation Act. Librarians are often certified before they may work in public libraries or K-12 school settings. Often, this certification hinges on completion of post-baccalaureate studies. The RISE Rule means that many individuals may choose not to pursue a librarian career path because they cannot afford to do so without the full array of loan financing, and those that do opt to pursue the degree may be forced to take out additional private loans, generally on more onerous terms. This will likely lead to staffing shortages in a field that is already faced with the challenges of new technologies, budget cuts, and low morale.

86. Finally, public health is another example of a field that will be negatively impacted by the RISE Rule. While public health professionals are not licensed, biostatisticians and epidemiologists, for example, often receive their specialized training via graduate level coursework and are not hired by state or local health departments (or promoted to such positions within those departments) without the applied skills and overall public health background and competencies provided by such training. The RISE Rule will likely prevent individuals from pursuing these specialized positions because they cannot afford to do so without the full array of loan financing, and if they do choose to pursue the degrees, may require more private loan financing, generally with more onerous terms. As a result, graduates may be dissuaded from entering the public sector, instead opting for higher-paying private sector jobs. Thus, the Rise Rule will have negative impacts on state and local health departments at the same time they are contending with emerging public health crises.

87. As highlighted, many professions excluded by the RISE Rule currently face significant shortages and retention crises. The practical result of the final RISE Rule, unless set aside, will

25

be to impose yet further barriers to recruiting and retaining skilled professionals in the several public-service-minded professions excluded by the RISE Rule from access to the higher loan limits associated with "professional" programs of study, impacting not just would-be graduates, but the availability and quality of these essential services.

**Subsequent Developments**

88. On June 24, 2026, Hon. Beryl A. Howell, United States District Judge of the District Court for the District of Columbia, preliminarily enjoined implementation of part of the RISE Rule's definition of "professional degree." Specifically, the Court stayed subpart (i) of the Department's definition of "professional degree," as well as the requirement in the preamble to the Rule that professional degrees cannot "lead[] to employment that ordinarily must be supervised by a licensed professional in a different occupation and cannot be performed independently." *See Am. Ass'n of Nurse Prac.*, 1:26-cv-1780-BAH, ECF No. 45 (June 24, 3036). In response, the Department issued an interim announcement that expanded the universe of degrees that it would treat as professional, while making clear that it was doing so only for the duration of the Court's stay. *See id*. ECF No. 47-1. The Department then updated that revised list on July 10. *See id*. ECF No. 50-1.

89. The updated list of degrees does not explain what criteria, beyond the statutory definition, the Department used to arrive at its updated list of professional degrees. The guidance includes certain advanced nursing degrees, like MSN and DNP degrees as professional. It does not include master degrees in social work, public health, library science, or education, as professional.

**STATEMENT OF CLAIMS**

**COUNT ONE—APA §706(2)(A)**
**DEFINITION OF "PROFESSIONAL STUDENT" (34 C.F.R. § 685.102)**

**DOES NOT ACCORD WITH LAW**

90. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

91. The Department is an "agency" under the APA. 5 U.S.C. §551(1)

92. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with law." 5 U.S.C. § 706(2)(A).

93. The Reconciliation Act defines a professional student as a student who satisfies three, and only three, criteria. The student must be enrolled in a program of study that awards a degree that, first, "signifies completion of the academic requirements for beginning practice in a given profession," and, second, signifies "a level of professional skill beyond that normally required for a bachelor's degree." Reconciliation Act, § 81001 (incorporating 34 C.F.R. § 668.2). Third, "[p]rofessional licensure is also generally required" to practice the student's profession. *Id.*

94. The RISE Rule is final agency action that conflicts with the Reconciliation Act in several ways.

95. Among other conflicts, the RISE Rule (1) requires a program to be one of eleven programs enumerated in the regulation, even though the statute contains an open-ended functional test (merely illustrated with a non-exhaustive list of examples); (2) requires a degree to be necessary to enter a profession, even though the statute requires only that the degree communicate publicly an educational institution's belief that the graduate is ready to begin practice (regardless of whether the profession actually insists on a degree as a prerequisite to practice[3]); (3) requires a degree as a universal prerequisite to practice a profession, even though

---

[3] This distinction is made pellucid by the statute's inclusion of law and theology as exemplars of professional programs. In neither program is a degree universally required to begin practice of the profession. The Rule is thus contrary to law by insisting that a professional universally require a degree as a prerequisite to practice.

27

the statute requires only that a degree be generally required—and thus subject to exception; (4) excludes professions whose practitioners are supervised by other licensed professionals, even though the statute contains no such requirement; and (5) specifically excludes several professions that satisfy all statutory criteria.

96. The Department's regulatory definition of "professional student" is thus contrary to the statutory definition established by the Reconciliation Act.

97. Plaintiffs are entitled to a declaration that the RISE Rule violates the APA because the regulatory definition of "professional student" is contrary to the Reconciliation Act.

98. Plaintiffs are entitled to an order vacating and setting aside the RISE Rule to the extent it is contrary to the Reconciliation Act.

**COUNT TWO—APA §706(2)(C)**
**DEFINITION OF "PROFESSIONAL STUDENT" (34 C.F.R. § 685.102)**
**EXCEEDS STATUTORY AUTHORITY**

99. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

100. The Department is an "agency" under the APA. 5 U.S.C. §551(1)

101. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be …. in excess of statutory jurisdiction, authority, or limitations". 5 U.S.C. § 706(2)(C).

102. In our system of government, federal agencies have only the authority Congress confers upon them. *See, e.g.*, *W. Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("Agencies have only those powers given to them by Congress, and "enabling legislation" is generally not an "open book to which the agency [may] add pages and change the plot line."); *FEC v. Cruz*, 596 U.S. 289, 301 (2022) ("An agency, after all, 'literally has no power to act'—including under its

regulations—unless and until Congress authorizes it to do so by statute."), *Louisiana Pub. Serv. Commn. v. F.C.C.*, 476 U.S. 355, 357 (1986) ("an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.").

103. The Reconciliation Act defines a professional student as a student who satisfies three, and only three, criteria. The student must be enrolled in a program of study that awards a degree that, first, "signifies completion of the academic requirements for beginning practice in a given profession," and, second, signifies "a level of professional skill beyond that normally required for a bachelor's degree." Reconciliation Act, § 81001 (incorporating 34 C.F.R. § 668.2). Third, "[p]rofessional licensure is also generally required" to practice the student's profession. *Id.*

104. The RISE Rule is final agency action that conflicts with the Reconciliation Act in several ways.

105. Among other conflicts, the RISE Rule (1) requires a program to be one of eleven programs enumerated in the regulation, even though the statute contains an open-ended functional test (simply illustrated with a non-exhaustive list of examples); (2) requires a degree to be necessary to enter a profession, even though the statute requires only that the degree communicate publicly an educational institution's belief that the graduate is ready to begin practice (regardless of whether the profession actually insists on a degree as a prerequisite to practice); (3) requires a degree as a universal prerequisite to practice a profession, even though the statute requires only that a degree be generally required—and thus subject to exception; (4) excludes professions whose practitioners are supervised by other licensed professionals, even though the statute contains no such requirement; and (5) specifically excludes several professions that satisfy all statutory criteria.

106. The Reconciliation Act does not authorize the Department to adopt a definition of "professional student" in conflict with the statutory definition.

107. Neither does HEA. Although HEA authorizes the Department to make rules, the Department may do so only "pursuant to law" and "subject to limitations as may be otherwise imposed by law." 20 U.S.C. §1221e-3.

108. Neither the Reconciliation Act nor HEA authorizes the Department to adopt a definition of "professional student" that conflicts with the statutory definition.

109. Plaintiffs are entitled to a declaration that the Department has no authority to issue a rule that defines "professional student" in a manner that conflicts with the Reconciliation Act.

110. Plaintiffs are entitled to an order vacating and setting aside the RISE Rule to the extent its definition of "professional student" exceeds the agency's rulemaking authority.

### COUNT THREE—APA §706(2)(A)
### DEFINITION OF "PROFESSIONAL STUDENT" (34 C.F.R. § 685.102) IS ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION

111. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

112. The Department is an "agency" under the APA. 5 U.S.C. §551(1)

113. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion … ". 5 U.S.C. § 706(2)(A).

114. Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product

of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted).

115.    The RISE Rule is final agency action that is arbitrary and capricious because it conflicts in several ways with the Reconciliation Act. It thereby relied on factors Congress did not intend it to rely on.

116.    The Rise Rule is also arbitrary and capricious including because it (1) excludes professions whose practitioners may enter the profession without a degree or license, and who are supervised by other licensed professions; (2) relies on CIP codes, which have been disclaimed for use in regulation and which the Department has failed to show—or even attempt to show—track the statutory criteria for professional students; (3) excludes several professions from the higher loan limits applicable to "professional students," even where the professions are short-staffed and the exclusions will have the foreseeable effect of exacerbating challenges in the delivery of health care, teaching, public health, social work, and other vital professions; (4) excludes several professions from the higher loan limits applicable to "professional students," even where the cost of obtaining a degree to pursue that profession far exceeds the lower graduate student loan limits, rendering those degrees effectively out of reach for many, if not most, prospective students; (5) fails to reasonably engage with and explain why it rejected commenters' suggestion to maintain higher loan caps for programs entailing specialized training and exceptionally high costs; and (6) fails to reasonably engage with and explain why it rejected the multiple comments advocating for more expansive definitions of "professional student" that accord with the Act.

**COUNT FOUR—APA §706(2)(A)**
**LIMITATIONS ON INTERIM EXCEPTION (34 C.F.R. § 685.203)**
**DO NOT ACCORD WITH LAW**

117. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

118. The Department is an "agency" under the APA. 5 U.S.C. §551(1)

119. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be …. not in accordance with law." 5 U.S.C. § 706(2)(A).

120. The Reconciliation Act provides that its new loan limits "shall not apply" "during [a student's] expected time to credential" for any student who, "as of June 30, 2026," meets two criteria: (1) they must be "enrolled in a program of study at an institution of higher education," and (2) they must have "received a loan . . . for such program of study." 20 U.S.C. § 1087e(a)(8)(A). The Act does not impose any other criteria to qualify for the interim exception.

121. The RISE Rule is final agency action that conflicts with the Reconciliation Act because it excludes from the interim exception students who meet these two criteria, but who, subsequent to June 30, 2026, either withdraw temporarily from their degree program or transfer to a different institution, even if they maintain the same program of study. *See* 91 Fed. Reg. at 23,813-14.

122. The statute's mandatory language that the Reconciliation Act's changes to federal educational lending "shall not apply" to students who meet the two statutory criteria does not admit of these additional criteria. The RISE Rule is thus contrary to law.

123. Plaintiffs are entitled to an order vacating and setting aside the RISE Rule to the extent it is contrary to the Reconciliation Act.

**COUNT FIVE—APA §706(2)(C)**
**LIMITATIONS ON INTERIM EXCEPTION (34 C.F.R. § 685.203)**
**EXCEED STATUTORY AUTHORITY**

124. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

125. The Department is an "agency" under the APA. 5 U.S.C. §551(1)

126. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

127. "Agencies have only those powers given to them by Congress, and "enabling legislation" is generally not an "open book to which the agency [may] add pages and change the plot line." *W. Virginia v. EPA*, 597 U.S. 697, 723 (2022).

128. The Reconciliation Act provides that its new loan limits "shall not apply" "during [a student's] expected time to credential" for any student who, "as of June 30, 2026," meets two criteria: (1) they must be "enrolled in a program of study at an institution of higher education," and (2) they must have "received a loan … for such program of study." 20 U.S.C. § 1087e(a)(8)(A). The Act does not impose any other criteria to qualify for the interim exception.

129. The RISE Rule is final agency action that exceeds this statutory provision because it excludes from the interim exception students who meet these two criteria, but who, subsequent to June 30, 2026, either withdraw temporarily from their degree program, or transfer to a different institution, even if they maintain the same program of study. *See* 91 Fed. Reg. at 23,813-14.

130. The statute's mandatory language that the Reconciliation Act's changes to federal educational lending "shall not apply" to students who meet the two statutory criteria does not admit of these additional criteria. The RISE Rule thus exceeds ED's authority under the Reconciliation Act.

131. Plaintiffs are entitled to a declaration that the Department has no authority to issue a rule that places additional limitations on who may be exempted from the Rule's changes to federal loan financing.

132. Plaintiffs are entitled to an order vacating and setting aside the RISE Rule to the extent it exceeds the agency's rulemaking authority.

### COUNT SIX—APA §706(2)(A)
### LIMITATIONS ON INTERIM EXCEPTION (34 C.F.R. § 685.203) ARE ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION

133. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

134. The Department is an "agency" under the APA. 5 U.S.C. §551(1)

135. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion … ". 5 U.S.C. § 706(2)(A).

136. Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An "agency must examine the relevant data

and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. (quotation marks omitted).

137.     The RISE Rule is final agency action that is arbitrary and capricious because it excludes students who transfer institutions but maintain the same program of study, and students who temporarily withdraw from a program of study, from the Reconciliation Act's interim exception. In doing so, the Department failed to explain why it imposed this additional limitation and certainly did not offer a reasoned basis for doing so. Indeed, in rejecting commenters' concerns regarding the effect of the rule on transfer students, the Department provided no reasoning, merely asserting that "[i]f a student transfers to a different institution, even in the same program of study, the Department would consider that to be a new program of study." 91 Fed. Reg. at 23,814. The Department offered a similarly unreasoned explanation for rejecting concerns regarding students who withdraw temporarily. *Id*. at 23,813. Moreover, in excluding students who meet the statutory interim exception from its coverage, the Department failed to consider the reliance interests of students and schools that will be affected by this additional hurdle to educational financing.

## COUNT SEVEN—APA §706(2)(A) , 702(2)(D)
### UNLAWFUL WAIVER OF HEA MASTER CALENDAR REQUIREMENTS

138.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth here.

139.     "To assure adequate notification and timely delivery of student aid funds" under the Direct Loan program, the HEA requires the Department to "adhere to [specified] calendar dates in the year preceding the award year." 20 U.S.C. § 1089(a)).

140.     Subject to certain exceptions inapplicable here, "any regulatory changes initiated by the Secretary affecting the [Direct Loan programs] that have not been published in final form by

35

November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1).

141. The Department did not publish the final RISE Rule in the Federal Register until May 1, 2026.

142. Under the master calendar requirements set forth in 20 U.S.C. § 1089, the RISE Rule cannot become effective until July 1, 2027.

143. Yet, the RISE Rule purports to become effective on July 1, 2026, a full year early. 91 Fed. Reg. 23,768, 23,770.

144. The Department attempts to justify this violation of the HEA master calendar requirements by contending that the Reconciliation Act implicitly waived the master calendar requirements by requiring the Department to implement several provisions by July 1, 2026. 91 Fed. Reg. 23,770.

145. It further contends, without explanation, that "[m]any of these provisions are not self-executing and could not be implemented absent the Department promulgating regulations to provide details for institutions on how to comply with the Working Families Tax Act." *Id.*

146. The Department makes no specific contention that the Reconciliation Act's definition of "professional student" is one of the provisions that is not self-executing.

147. Nor could it. The Reconciliation Act defines "professional student" expressly, leaving no discretion to the Department to depart from that express definition. The statutory definition of "professional student," in other words, *is* self-executing and did not require further regulation to become operative.

148. The Reconciliation Act thus does not waive the HEA master calendar requirements, expressly or impliedly.

149.    As a result, the RISE Rule's definition of "professional student" cannot lawfully go into effect before July 1, 2027 (if it can lawfully go into effect at all).

150.    By purporting to become effective on July 1, 2026, the RISE Rule is "not in accordance of law" and must be held "unlawful and set aside." 5 U.S.C. § 706(2)(A).

151.    By purporting to become effective on July 1, 2026, the RISE Rule is 'without observed of procedure required by law"—namely, the HEA master calendar requirements—and must be held "unlawful and set aside." 5 U.S.C. § 706(2)(D).

152.    By purporting to become effective on July 1, 2026, the RISE Rule is arbitrary and capricious. It flouts the factors Congress intended the Department to consider and fails to account for reliance interests by introducing confusion and chaos into the federal student loan scheme. 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court to enter judgment in their favor and

1.  Declare the RISE Rule violates the Reconciliation Act and the Higher Education Act, exceeds ED's statutory authority, and is arbitrary, capricious, and abusive of ED's discretion.

2.  Vacate and set aside the RISE Rule. 5 U.S.C. § 706(2).

3.  Issue an injunction barring ED and its agents and employees from implementing and enforcing the RISE Rule, at least to the extent that it runs afoul of the Reconciliation Act's requirements.

4.  Postpone the effective date of the RISE Rule as necessary to prevent irreparable injury. 5. U.S.C. § 705.

5.  Award Plaintiffs costs, including reasonable attorney's fees.

6. Grant such other relief as is just and proper.

Dated: August 11, 2026

Respectfully submitted,

/s/ Darin M. Dalmat
Matthew J. Ginsburg (DC Bar No. 1001159)
Darin M. Dalmat (DC Bar No. 978922)
AFL-CIO
815 16th St, NW
Washington, DC 20006
202-637-5021
mginsburg@aflcio.org
ddalmat@aflcio.org

/s/ Georgina Yeomans
Teague Paterson (DC Bar No. 144528)
Matthew Blumin (DC Bar No. 1007008)
Georgina Yeomans (DC Bar No. 1510777)
AFSCME
1625 l St, NW
Washington, DC 20063
202-775-5900
tpaterson@afscme.org
mblumin@afscme.org
gyomans@afscme.org

/s/ Dan McNeil
Dan McNeil (DC Bar No. 455712)
Drew Schendt (DC Bar No. 90014698)
American Federation of Teachers
555 New Jersey Ave, NW
Washington, DC 20001
202-393-6305
dmcneil@aft.org

/s/ David Wilhoite
David Wilhoite*
National Nurses United
8455 Colesville Rd
Silver Spring, MD 20910
510-273-2200
dwilhoite@calnurses.org

*Application for admission *pro hac vice* forthcoming